# Intervention by States and Private Groups in the Internal Affairs of Another State

It would appear to be a violation of international law relating to neutrality if a neutral state permits the launching of an attack by organized armed forces from within its borders, permits the passage of organized armed forces through its territory, or permits armed forces to be organized and trained for such purpose within its borders.

There would appear to be no violation of international law where a neutral state permits the mere provision of arms by private parties, even the stockpiling of arms, as long as they remain within the control of private groups rather than belligerent parties, or permits volunteers to be recruited, assembled, and perhaps even trained, so long as this does not approach the point of an organized military force.

April 12, 1961

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

## I. General Principles

The structure of international law has traditionally been viewed as imposing obligations upon states only, and not (with very rare exceptions) upon individuals or sub-national groups. Therefore international law with respect to intervention in the internal affairs of another state, by force or other means, is designed to set standards for the conduct of states. If the provision of arms, personnel, or other assistance by private groups is in violation of international law, it can only be because a state actively assists such groups—therefore making it state action—or fails to take measures required by international law to prevent such activities. It should be said at the outset that there is very little in the way of authority or precedent with regard to the obligations of states to control or prevent such activities within their borders. The prohibitions of national laws relating to neutrality in general go much further than international law would seem to require.

What international law and precedent there appears to be on the subject is primarily concerned with the obligations of neutral states in the event of war or civil war abroad where the revolutionary forces have been accorded belligerent status. Under these circumstances it would appear to be a violation of international law relating to neutrality if a state permits the launching of an attack by organized armed forces from within its borders; permits the passage of organized troops through its territory; and, it would seem, permits armed forces to be organized and trained for such purpose within its borders. On the other hand, there would appear to be no violation of this precedent by the mere provision of arms by private parties, even the stockpiling of arms, as long as they remain within the control of private groups rather than belligerent parties, or by permitting volunteers to be recruited, assembled, and perhaps even trained so long as this did not approach the point of an organized military force.

The foregoing would apply to activities by foreign nationals and equally to activities by one's own nationals so long as these activities were "private" and there was no official participation by the state claiming neutrality.

It would appear that the foregoing brief description derived from international law relating to neutrality would be the most severe test possible in a situation where war had not broken out. That is, it would seem that the obligations of the state to prevent revolutionary activities aimed at the government of a foreign state from taking place within its borders could not be more than its obligations as a neutral in the event hostilities had taken place. Indeed, these obligations may be considerably less since the state involved is not claiming a formally neutral status and since the primary purpose of international law relating to neutrality is to prevent the spread of hostilities. Viewed in terms of this overriding objective, a good case could be made for the fact that a state may be more tolerant of activities within its borders aimed at the overthrow of a foreign government than it could be in the event of actual warfare sufficiently extensive to warrant laws of war being applied.

One or two general comments with regard to the purpose of international law may be useful in this connection. The inherited doctrine from the pre-World War I period is geared to concepts of independent states within a security structure largely related to neutrality of alignment; that is, the security system which existed in the nineteenth century was closely related to the balance of power political system, which in turn depended upon the absence of long-term, enduring relationships among states. States had to be free to change their alignment any time the balance was threatened, and free to use force whenever the system required it. Checks on the use of force were, therefore, political ones rather than legal ones, and war was not formally outlawed.

The political structure today is vastly different. Alignments within the Communist Bloc and within the West are long-term political alignments with considerable aspects of supra-national authority. As a result, the security system from the point of view of each bloc depends less upon neutrality of alignment than it does upon preserving the alignments which exist. Therefore, despite changed legal doctrine, there is considerable pressure for intervention in situations where bloc security is threatened. There is nothing in the existing legal structure which recognizes this state of affairs, but there are numerous instances where intervention has been tolerated in the postwar period; for example, Hungary, Guatemala, Lebanon, and, in 1948, Israel.

## II. Intervention by States

I think it is a fair reading of international law today that military intervention by an individual state is not permissible under the United Nations ("U.N.") Charter except in the following circumstances:

(1) Force may be used in self-defense under Article 51 of the Charter, and may be employed under this Article by states not directly affected as a result of collective security arrangements;

(2) Intervention may be employed pursuant to an order of the U.N. Security Council or, more doubtfully, the General Assembly under the Uniting for Peace Resolution, G.A. Res. 377 (V), U.N. GAOR, 5th Sess., Supp. No. 20, U.N. Doc. A/1775, at 10 (Nov. 3, 1950);

(3) Intervention may be employed by states collectively under regional arrangements such as the Organization of American States ("OAS") where the objective is to restore peace and security to an area otherwise threatened;

(4) A state may legitimately intervene by assisting the government of another state in repressing revolutionary activities if requested by the legitimate government of the state in question to assist. This latter idea is the basis for our military aid programs (along with Article 51) and for the interventions in Lebanon by the United States and Hungary by the Union of Soviet Socialist Republics ("USSR"). It would justify shipment of arms by Russia today to the Castro government in Cuba, unless the United States were successfully to persuade the OAS or the United Nations that such conduct endangered international peace and security.

The foregoing indicates that it is a great deal easier legally to preserve the status quo than it is to change it. In general, it would seem that U.S. support for strict policies of non-intervention is based upon the fact that it is generally the USSR which is trying to subvert an existing government and the U.S. which is trying to preserve it. Wherever this is the case, the formal legal structure supports the country endeavoring to protect the existing status quo, since military aid and assistance are under these circumstances legitimate.

The United Nations Charter and the Charter of the Organization of American States forbid only intervention by states. Article 15 of the OAS Charter goes somewhat further than the U.N. Charter since it prohibits intervention "directly or indirectly." Article 15 reads as follows:

No State or group of States has the right to intervene, directly or indirectly, for any reason whatever, in the internal or external affairs of any other State. The foregoing principle prohibits not only armed force but also any other form of interference or attempted threat against the personality of the State or against its political, economic and cultural elements.

OAS Charter, Apr. 30, 1948, T.I.A.S. No. 2361, 2 U.S.T. 2416, 2419–20, 119 U.N.T.S. 48, 56. The exact meaning of the prohibition with regard to "indirect" intervention is by no means clear. But it would seem to be aimed at something which a state did rather than, in most circumstances, something which a state failed to do. It might easily be argued that it is a formal prohibition against a state actively assisting revolutionary forces through the provision of weapons, money, or government facilities. It is much more questionable that it requires a state actively to prohibit revolutionary activities within its borders, though it may do so when these approach a certain formal status; that is, permitting an armed attack to be mounted within one's borders.

### III. Activities of Private Groups

As has been indicated above, there is relatively little authority as to the scope of state responsibility for preventing and repressing revolutionary acts of private persons against foreign states. The Russians have relied upon this absence of authority repeatedly in the past; for example, the "volunteers" in the Korean conflict, and those threatened at the time of the Suez and Lebanon crises. The late Judge Lauterpacht summarized the law in 1928 as follows:

> International law imposes upon the state the duty of restraining persons resident within its territory from engaging in such revolutionary activities against friendly states as amount to organized acts of force in the form of hostile expeditions against the territory of those states. It also obliges the state to repress and to discourage activities in which attempts against the life of political opponents are regarded as a proper means of revolutionary action.

> Apart from this, states are not bound to prohibit, on their territory, the commission of acts injurious to other states.

H. Lauterpacht, *Revolutionary Activities by Private Persons Against Foreign States*, 22 Am. J. Int. L. 105, 126 (1928).

I find relatively little precedent since 1928 which would lead me to question Lauterpacht's conclusions. I think these can be justified on quite sound policy grounds. Surely international law does not require a state to restrict private activities in any absolute fashion. Furthermore, the provisions against warfare are primarily aimed at the kind of organized activities which can be only mounted by a state because these are the kinds of activities which raise serious international consequences and which constitute the greatest danger in the world today. It would seem to me that a tolerance in regard to private assistance of revolutionary groups raises questions of a quite different order in most circumstances. This is not always the case, because in certain parts of the world, particularly on the East-

West border, even the smallest incident could result in large-scale hostilities. But surely this is not true in areas such as, for example, Latin America.

Furthermore, in Latin America the United States has gained the acquiescence of other Latin American countries in the basic principle that a communist government in the area constitutes a threat to all. While the refusal of other states to act collectively, as provided in the Rio Pact (Inter-American Treaty of Reciprocal Assistance, *opened for signature* Sept. 2, 1947, 62 Stat. 1681), might preclude unilateral U.S. activity, it seems to me that the collective adoption of this principle would justify the United States in tolerating activities aimed at an overthrow of the communist government to a greater degree than would otherwise be the case.

Finally, our own neutrality laws go much further in preventing private activities of the type discussed herein than international law would go. At the same time, these laws are primarily aimed at a highly organized revolutionary force being mounted in this country for the purpose of overthrowing a foreign government.

NICHOLAS deB. KATZENBACH
*Assistant Attorney General*
*Office of Legal Counsel*
